STATE v. ADAMS.

(Filed October 20, 1903.)

LARCENY — *Receiving Stolen Goods — Instructions — Indictment — Counts.*

Where an indictment charges in one count larceny and in another the receiving of stolen goods, and the instructions relate only to the first count, and the defendant is found guilty on the second count, a new trial will be granted.

INDICTMENT against H. B. Adams, heard by Judge *H. R. Bryan* and a jury, at July Term, 1903, of the Superior Court of ROBESON County. From a verdict of guilty and judgment thereon the defendant appealed.

*Robert D. Gilmer, Attorney-General,* and *McLean, McLean & McCormick,* for the State.
*McIntyre & Lawrence,* for the defendant.

CONNOR, J. The defendant was indicted in one count for the larceny of two sacks of guano, and in the second count for receiving the said two sacks of guano knowing them to have been stolen.

The State introduced J. W. Carter, who testified that he lived in Maxton and was a merchant; that on the night of May 20th his warehouse was broken open and some Acme Guano taken out. Several sacks were lost. That he saw tracks at the back of the door of the warehouse, and about thirty or forty steps away he found wheelbarrow tracks. Same tracks from back door to wheelbarrow. That he followed the wheelbarrow down the railroad and across through the woods and struck a cotton-patch that defendant cultivates right near his house. That the track went by end of cotton

rows and then struck the main road within about fifty yards of defendant's house and then went up to a shelter at or near his back door. That he saw defendant next morning; met him at end of cotton rows. That he was dragging his feet like he was trying to cover up tracks. That they passed each other and defendant said "good morning." Witness told him that some one had broken into his warehouse the night before and had taken two sacks of guano and that he had followed the wheelbarrow tracks, and witness said: "Now, Adams, pretty close to your house." Witness asked him if he knew anything of the fertilizer. Defendant said "Yes," that there were two sacks in that shelter. They went to the shelter and found two sacks of fertilizer covered up. They began to uncover it. Defendant said he didn't know how it got there; that the year before he had bought some from some of the boys; that perhaps Jesse McLean put it there. McLean came up about this time and Adams asked him if he put it there. McLean said: "You know very well I had nothing to do with it." Witness went back to town and got out a warrant. That he could not find where tracks led from the shelter. That he found the wheelbarrow some five hundred yards away in a ditch. Bushes had grown up beside the ditch. That they found a place near the railroad where it looked like the whole load, wheelbarrow and all, had been upset. Milton McRae claimed the wheelbarrow. That defendant requested that Jesse McLean be called as a witness before the magistrate. He asked the deputy sheriff to get him as a witness, but he did not ask the magistrate to subpœna him.

Andrew Wilkinson, who was introduced for the State, says that he saw the wheelbarrow in the ditch on the night of the 20th about 12 o'clock; that he went after Andrew Malloy, and when he came back the wheelbarrow and guano were gone; that he saw the back door of Carter's warehouse open, and saw tracks the next day and measured the tracks; that the

heel was slightly curved in front and worn at back, and he measured defendant's shoe and it was the same as the tracks— front part of heel was curved : that he saw defendant's shoe put in the tracks—fitted exactly—he saw the tracks following the wheelbarrow and they looked like those he had measured.

Defendant testified that he did not leave his house during the night; that his wife was about to be confined; he saw the guano there early the next morning and told Robert George about it; that he was not kicking out tracks, but was kicking in the dirt to see if it was wet enough to set out potato slips; it had rained the night before.

The defendant's wife testified that her husband was home all night, and she was expecting to be confined and did not sleep well; that she was confined on the 24th; that on Friday morning the defendant spoke to her about the guano, and said he did not know where it came from.

Robert George, witness for the defendant, testified that he saw the defendant the next morning and he said there was some guano that should be moved.

His Honor charged the jury among other things as follows: "The law is that a person found in such recent possession of stolen property that he could not reasonably have gotten possession unless he had stolen it raises a presumption of his guilt and throws the burden on the defendant to account for his possession. If you find that Carter's property was stolen and found next day in defendant's possession, and he has failed to account for it to your satisfaction, then you will find him guilty." Defendant excepted. The jury returned a verdict "guilty of receiving good knowing them to have been stolen," and from the judgment rendered thereon the defendant appealed.

We must assume that the charge is correctly set out in the record, and as it nowhere appears therein that his Honor

gave any instruction to the jury upon the second count in the bill of indictment, or directed their attention to the testimony or law bearing thereon, we think the defendant is entitled to a new trial. The verdict omits any finding on the first count, and thus leads to the conclusion that the jury did not find .that the defendant made the track following the wheelbarrow to the shelter under which the guano was found. It is by no means clear that the guano was, in the usual or legal signification of the term, found in the *possession* of the defendant. The shelter was open, easily accessible to any one, about fifty yards from the public road and near the defendant's back door. It is evident that but one person carried the guano to the place where it was found. The wheelbarrow was not the property of the defendant, nor was it shown that any tracks were found returning to the defendant's house from the place where it was found. So soon as the defendant is asked by the prosecutor whether there was any guano on his premises he promptly responded and showed it to him. Eliminating the tracks, and taking it as found by the jury that they were made by some person other than the defendant, the only evidence connecting him with the larceny is the fact that the guano is found in an open buggy-shelter on his premises the morning following the larceny. His conduct was not, it seems to us, inconsistent with that of an honest man. While we do not say that there was *no* evidence fit to be considered by the jury, we think the Judge should have instructed them in regard to the facts necessary to be found before they could convict the defendant upon the second count in the bill. His charge in regard to the presumption arising from possession was limited to the general verdict of guilty without regard to the separate and distinct charges contained in the bill. The presumption which the law raises from the recent possession of stolen property is that the person having such possession is the thief, not that some one else being the thief the defend-

ant's possession is with guilty knowledge of the theft. Certainly if one awoke in the morning finding a stolen horse in his stable, and it being shown that some other person put it there, the law would raise no presumption that it was done with the knowledge of the owner of the stable. This would be a hard rule, and in direct contravention of that which *Mr. Justice Ashe* lays down in *State v. Massey,* 86 N. C., 660, 41 Am. Rep., 478, quoting the dissenting opinion in *State v. Neely,* 74 N. C., 425, 21 Am. Rep., 496, which was adopted as the law: "It is neither charity nor common sense nor law to infer the worst intent which the facts will admit of. The reverse is the rule of justice and law.  *  *  * The guilt of a person is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence." The charge of his Honor, assuming that the stolen property was found in the possession of the defendant, says to the jury that the law presumes that he is *guilty*. The question arises: guilty of what? The law says: of the theft. The jury say he is not guilty of the theft, but is guilty of receiving, etc. Under the general charge of his Honor, the jury may well have applied the language to the second count and found him guilty "by presumption of law," as was the view of Mr. Saddletrees in the case of Scott's unfortunate heroine, Effie Deans. Presumptions of law are useful to courts and juries in seeking to ascertain the truth, but the criminal records of all ages and people have shown that great and often irreparable wrongs have been done when they are pressed too far. It may well admit of question whether it be not more consonant with the genius of our law to permit the juries, under proper instruction of the Court, to find the truth as they believe it to be, certainly in criminal cases, drawing such inferences and conclusions from admissions and facts proved to their satisfaction as experience, observation and reason suggest. The facts in regard to finding the

guano, the place in which it was found, the time at which it was found, the conduct, language, etc., of the defendant, are all circumstances to be considered by the jury, subject to all such reasonable and just inferences as they may draw therefrom. The distinction between a presumption of law and an inference of fact is clearly pointed out by *Walker J.*, in *Cogdell v. Railroad,* 132 N. C., 852.

New trial.